UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

COLAVITO ANTON BELL,

      Petitioner,

v.                                                                Case No. 3:22-cv-1210-HES-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

---

## ORDER

### I. Status

Petitioner Colavito Anton Bell, an inmate of the Florida penal system, initiated this action by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1).[1] In the Petition, Bell challenges a 2012 state court judgment of conviction in Duval County for first-degree murder. He raises five grounds for relief. (Doc. 1 at 5–12). Respondents submitted a memorandum in opposition to the Petition with exhibits. (Doc. 13). Bell filed a brief in reply (Doc. 19). This action is ripe for review.

---

[1] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

## II. Relevant Procedural History

An indictment charged Bell with first-degree murder. (Doc. 13-3 at 40). The indictment alleged that Bell killed Christopher Oney with a firearm. (Doc. 13-3 at 40).

At trial, Oney's fiance testified that Bell and Oney, whose nickname was Chip, worked as truck drivers and that she worked as a dispatcher at the company that contracted Bell and Oney to transport patio stones. (Doc. 13-3 at 419–23). She testified that Bell knew where Oney parked his truck at night. (Doc. 13-3 at 424). On January 23, 2008, in the early morning, Oney's fiance spoke with Oney on the telephone while he drove to pick up his truck for work. (Doc. 13-3 at 428). During the conversation, Oney's fiance heard a loud noise and heard Oney exclaim, "Oh, shit!" (Doc. 13-3 at 427–28). Oney's fiance drove to the lot where Oney kept his truck, found Oney on the ground bleeding, and called 911. (Doc. 13-3 at 429–31). A paramedic observed gunshot wounds to Oney's head. (Doc. 13-3 at 524–25). A medical examiner opined that the gunshots, which were inflicted at close range, caused Oney's death. (Doc. 13-3 at 861, 864–65).

2

In the early morning on the day of the shooting, a district manager for a newspaper drove by the lot where Oney parked his truck. (Doc. 13-3 at 457–62). The district manager saw a small, yellow sports car with tinted windows, a silver sticker on the driver's window, markings on the doors that looked like flares, and two big mufflers on the back. (Doc. 13-3 at 463–64, 467). Oney's fiance testified that Bell owned a yellow car with black stripes, tinted windows, and decals of a skull and crossbones on the side of the doors. (Doc. 13-3 at 440). A detective showed the district manager a picture of Bell's car (Doc. 13-3 at 494–95, 507–09), and the district manager identified Bell's car as the car that he saw that morning. (Doc. 13-3 at 472–74). A crime laboratory analyst testified that tire impressions found on a driveway near the lot where Oney parked his truck were consistent with the tires on Bell's car. (Doc. 13-3 at 492, 617–24, 636–38, 647–49, 804–10).

A site manager of the company that contracted with Bell and Oney testified that the dispatcher, who was Oney's girlfriend, had discretion to assign work to whomever she chose. (Doc. 13-3 at 556–57). He testified that some truck drivers were preferred over other drivers and that the company never guaranteed a driver a certain amount of work. (Doc. 13-3 at 558). He testified that Bell complained to him about the amount of work that the

3

dispatcher assigned him. (Doc. 13-3 at 559–61). Also, Oney's fiance confirmed that Bell had complained. (Doc. 13-3 at 451–52). Bell started working for the company two years before Oney. (Doc. 13-3 at 577). However, Oney earned $46,000.00 more than Bell in 2007, the year before the shooting. (Doc. 13-3 at 577–78). At the end of 2007 and the beginning of 2008, Bell told his sister that work was difficult because the price of gasoline had increased, that one of his trucking contracts had terminated, and that he experienced problems with another contract. (Doc. 13-3 at 705–06).

Bell's ex-girlfriend testified that, on January 24, 2008 in the early morning, Bell called her on the telephone and asked to come over to her home. (Doc. 13-3 at 672–73). She testified that she was not expecting a call from him and that, when he arrived, he looked frightened. (Doc. 13-3 at 673–75). She testified that she asked him if he had hurt someone, and he responded, "No." (Doc. 13-3 at 676). She testified that she asked him if he had killed someone, and he responded, "Yes." (Doc. 13-3 at 676). She testified that Bell asked for the names and telephone numbers of her family who lived in Jamaica because he planned to leave the country. (Doc. 13-3 at 677). She testified that she refused and told Bell that authorities in Jamaica would extradite him to the United States. (Doc. 13-3 at 677–78). She testified that

4

Bell became upset, replied that he instead would flee to Belize, and left. (Doc. 13-3 at 678).

Adlai Bell, Bell's brother who lived in Arizona and who had eleven convictions for felony crimes and crimes of dishonesty, testified that Bell unexpectedly visited him. (Doc. 13-3 at 726–28). Adlai testified that, during the visit, Bell confessed that he had driven to the truck yard where he worked and shot a person named Chip two or three times in the upper body. (Doc. 13-3 at 729–30). Adlai testified that Bell admitted that he threw in a river both the clothes that he wore during the shooting and the gun that he used to shoot Chip. (Doc. 13-3 at 731). Adlai testified that Bell stated that he drove to the truck yard in his yellow sedan. (Doc. 13-3 at 732). Adlai testified that Bell stated that he initially went to the truck yard to shoot the dispatcher because of problems with her at work and instead shot Chip, the dispatcher's boyfriend, because he could not find the dispatcher. (Doc. 13-3 at 732–33). Adlai testified that Bell stayed with him in Arizona for about two months. (Doc. 13-3 at 734).

On cross-examination, Adlai admitted that he felt resentful because Bell earned more money than him, was the executor of an estate worth $300,000.00 that belonged to their aunt and uncle, refused to lend him money

5

during probate, and refused to allow him to stay in a home that he co-owned unless he paid $500.00 a month for rent. (Doc. 13-3 at 744–49).

Bell's fiance testified that in June of 2009, when she was moving her belongings out of the home that she shared with Bell because she wanted to end her relationship with him, Bell begged her to stay, apologized for "what he did," and wished he could "take it back." (Doc. 13-3 at 782–83). Bell's fiance testified that Bell did not specifically apologize for the murder, but she believed that Bell meant to apologize for the murder. (Doc. 13-3 at 784–85). On cross-examination, Bell's fiance testified that she was not certain that Bell apologized for the murder and admitted that Bell could have intended to apologize for infidelity. (Doc. 13-3 at 787–88, 790).

During the defense's case, Bell's friend who drove a truck testified that a truck driver's income fluctuates from week to week and month to month. (Doc. 13-3 at 895). Also, he testified that he had never seen Bell unable to control his temper. (Doc. 13-3 at 896–97). A detective testified that Bell voluntarily came to the sheriff's office for an interview, and the detective attempted to obtain a confession. (Doc. 13-3 at 907–15). After the interview, the detective allowed Bell to go home because at that time the evidence known to the detective did not support Bell's arrest. (Doc. 13-3 at 918). The

6

detective testified that he submitted many items for testing and did not discover any incriminating physical evidence. (Doc. 13-3 at 915–16, 919–21, 944). The detective testified that, during the evening of the shooting, Bell's mobile telephone connected to a cell tower away from the truck lot and closer to Bell's home. (Doc. 13-3 at 916–17). However, he explained that, at the time, a mobile telephone connected to a tower only during a telephone call. (Doc. 13-3 at 917).

A jury found Bell guilty of first-degree murder and further determined that Bell discharged a firearm that caused death or great bodily harm. (Doc. 13-3 at 73). The trial judge sentenced Bell to life in prison. (Doc. 13-3 at 230–35). The state appellate court affirmed Bell's conviction and sentence in a decision without a written opinion. (Doc. 13-8 at 2).

Bell filed a motion for post-conviction relief (Doc. 13-10 at 6–26) and a supplement to his post-conviction motion. (Doc. 13-10 at 82–99). The post-conviction court dismissed as untimely the claim in the supplement and denied the remaining claims in the post-conviction motion without an evidentiary hearing. (Doc. 13-10 at 130–42). The state appellate court affirmed in a decision without a written opinion. (Doc. 13-13). Bell's federal petition followed.

## III. One-Year Limitations Period

This action was timely filed within the one-year limitations period. See 28 U.S.C. § 2244(d).

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007). Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318–19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can adequately assess Bell's claims without further factual development, an evidentiary hearing will not be conducted. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003).

8

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. Lindh v. Murphy, 521 U.S. 320, 327 (1997). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Greene v. Fisher, 565 U.S. 34, 38 (2011) (citation and internal quotations omitted). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Thomas v. Att'y Gen., 992 F.3d 1162, 1184 (11th Cir. 2021) (citation omitted).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. Wilson v. Sellers, 584 U.S. 122, 125 (2018). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does

9

provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." Wilson, 584 U.S. at 125.

The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Wilson, 584 U.S. at 125–26.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254(d) as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the

10

Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 134 S. Ct. 10, 15 (2013); accord Brumfield v. Cain, 135 S. Ct. 2269, 2282 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). See also Landers v. Warden, Att'y Gen. of Ala.,

11

776 F.3d 1288, 1295 (11th Cir. 2015) (extending the holding in <u>Pinholster</u> to § 2254(d)(2)).

"AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>Burt v. Titlow</u>, 571 U.S. 12, 19 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" <u>Tharpe</u>, 834 F.3d at 1338 (quoting <u>Richter</u>, 562 U.S. at 102–03). This standard is "meant to be" a "difficult" one to meet. <u>Richter</u>, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

### B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. 28 U.S.C. § 2254(b)(1)(A). To properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review

12

process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)).

"In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is [ ] procedural default." Woodford v. Ngo, 548 U.S. 81, 92 (2006). "[I]f the petitioner procedurally defaulted [a] claim[ ], the prisoner generally is barred from asserting [the] claim[ ] in a federal habeas proceeding." Woodford, 548 U.S. at 93. Also, "a state court's invocation of a procedural rule to deny a prisoner's claim[ ] precludes federal review of the claim[ ] if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

"A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." Martinez, 566 U.S. at 10. Also, "[i]n certain exceptional cases involving a compelling claim of actual innocence, [ ] the state procedural default rule is not a bar to a federal habeas corpus petition." House v. Bell, 547 U.S. 518, 522 (2006).

13

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House, 547 U.S. at 536–37 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (first citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); and then Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688.

A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687.

Richter, 562 U.S. at 104. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

15

"[T]he standard for judging counsel's representation is a most deferential one." Richter, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." Id. (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 131 S. Ct. at 788.

Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014). "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" Nance v. Warden, Ga. Diagnostic Prison, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted). As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).

16

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

Bell asserts that trial counsel deficiently performed by not objecting to testimony by Bell's fiance that she believed that Bell apologized for committing the murder. (Doc. 1 at 5).

The post-conviction court denied the claim after determining that Bell failed to demonstrate deficient performance and prejudice under Strickland. (Doc. 13-10 at 132–36). For deficient performance, the post-conviction court determined that an objection to the testimony by Bell's ex-girlfriend would not have succeeded because the testimony was admissible. The post-conviction court concluded that the prosecutor impeached Bell's fiance about "her perspective on the meaning of a phrase from a one-on-one conversation between [her] and [Bell]." (Doc. 13-10 at 134). The post-conviction court further concluded that, even if the testimony was not impeachment, the testimony was admissible as lay opinion under Section 90.701, Florida Statutes. (Doc. 13-10 at 133–34).

Whether the testimony was admissible at trial is an issue of state law, and a state court's determination of state law receives deference in federal court. Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017)

17

("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [ ] counsel failed to raise turns on state law.") (citation omitted).

Diane Lockhart, Bell's fiance, testified that after the murder, when she was moving out of the home that she shared with Bell, Bell "made a confession of some sort." (Doc. 13-3 at 783). Lockhart described Bell's statements as follows (Doc. 13-3 at 783–85):

| [Prosecutor:] | What did the defendant say to you in that regard? |
|---|---|
| [Lockhart:] | Well, we were talking. I had informed Mr. Bell that I was going to leave, that we needed to separate for awhile and he just started saying, "Please don't go," and I said, you know, "I need to go," you know, "to clear my mind." "Please don't go." "But I need to go." "I'm sorry for what I did. If I could take it back, I would," and I stopped him and covered my ears, and I left the room. |
| [Prosecutor:] | And from knowing the defendant in the context of the conversation you were having with the defendant |

18

[Lockhart:]      apologizing to you, what was he apologizing about?

[Lockhart:]      I don't know what he was apologizing about. I stopped him.

[Prosecutor:]      Ms. Lockhart, do you recall giving a sworn statement in this matter?

[Lockhart:]      Yes, I did.

. . .

[Prosecutor:]      Do you recall this question by myself and your answer?

[Lockhart:]      [Question:] Okay. "Was it your understanding from the context of your relationship and the context of your conversation with him at that time that what he was saying he was sorry about was the murder?"

Your answer: "To my knowledge, I believe that's what he was saying he was sorry for."

[Prosecutor:]      Do you recall that question and that answer?

[Lockhart:]      Yes.

[Prosecutor:]      Was that the truth when you said it?

[Lockhart:]      Yes.

19

Because Lockhart did not testify at a trial or a hearing and was not subject to cross-examination when she made the prior statement, the prosecutor did not introduce the statement as substantive evidence. § 90.801(2)(a), Fla. Stat. State v. Green, 667 So. 2d 756, 759–60 (Fla. 1995); State v. Delgado-Santos, 497 So. 2d 1199, 1199 (Fla. 1986). The prosecutor instead impeached Lockhart with a prior inconsistent statement. "The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements." Pearce v. State, 880 So. 2d 561, 569 (Fla. 2004). Because Lockhart's testimony at trial materially differed from her sworn statement with the prosecutor, an objection to the testimony would not have succeeded. Pearce, 880 So. 2d at 569. Consequently, trial counsel did not deficiently perform. Pinkney, 876 F.3d at 1297 ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

For prejudice under Strickland, the post-conviction court determined that Lockhart's testimony about Bell's admission of guilt was cumulative to other evidence admitted at trial. (Doc. 13-10 at 135–36). Doreth Campbell,

20

Bell's ex-girlfriend, testified that, after the murder, Bell and his sisters came over to her home at five o'clock in the morning and that Bell admitted that he had killed a person. (Doc. 13-3 at 674–76). Adlai Bell, Bell's brother, testified that, after the murder, Bell traveled by plane to Arizona to visit him and told him that he had killed a person named "Chip" in the early morning at the yard where he worked by shooting him two or three times in the upper body. (Doc. 13-3 at 728–31). Because Lockhart's testimony about Bell's ambiguous admission was cumulative to these other more detailed confessions, Bell failed to demonstrate prejudice under Strickland. Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1355 (11th Cir. 2019).

Also, on cross-examination, Lockhart admitted that, when Bell apologized to her, she had suspected that Bell began a relationship with another woman. (Doc. 13-3 at 787). She testified that she was not certain whether Bell apologized for the murder or for the infidelity. (Doc. 13-3 at 788). She testified that she was confused during the interview when the prosecutor asked if Bell apologized for the murder. (Doc. 13-3 at 789–90). She admitted that she did not end her relationship with Bell because of the murder. (Doc. 13-3 at 788–90). Because trial counsel raised serious doubt that Bell apologized to his fiance for the murder, Bell cannot demonstrate a

21

reasonable probability that the outcome at trial would change if trial counsel had objected. Consequently, the post-conviction court did not unreasonably deny the claim. Strickland, 466 U.S. at 694.

Ground One is **DENIED.**

## B. Ground Two

Bell asserts that trial counsel deficiently performed by not investigating, cross-examining, and impeaching Lockhart about Bell's infidelity and the disease that Bell sexually transmitted to her. (Doc. 1 at 7).

The post-conviction court denied the claim because Bell speculated that the infidelity and the sexually transmitted disease motivated Lockhart to testify against him. (Doc. 13-10 at 136). Also, for prejudice under Strickland, the post-conviction court determined that Bell failed to demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had further cross-examined Lockhart because other compelling evidence proved Bell's guilt. (Doc. 13-10 at 136–37).

Bell presented no evidence either that he suffered from a sexually transmitted disease or that he transmitted the disease to Lockhart. Because "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner

22

as to what evidence could have been revealed by further investigation," the claim is meritless. Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985).

Also, as explained above, trial counsel cross-examined Lockhart about Bell's infidelity during their relationship. (Doc. 13-3 at 787). Lockhart testified that, when she was moving out of the home that she shared with Bell, she no longer trusted Bell because she suspected infidelity. (Doc. 13-3 at 787–88). She testified that she decided to end her relationship with Bell because of the lack of trust. (Doc. 13-3 at 788–89). Consequently, Bell's claim based on the infidelity is meritless.

Lastly, on redirect examination, Lockhart insisted that, during her interview with the detective and the prosecutor, the prosecutor did not want her to speak about the infidelity. (Doc. 13-3 at 792). Lockhart testified that she did not voluntarily come to the prosecutor's office for an interview or to court to testify at trial and that the prosecutor subpoenaed her to interview and to testify. (Doc. 13-3 at 793). This testimony convincingly rebuts Bell's contention that Lockhart testified against him because of the infidelity and the sexually transmitted disease.

Because Bell fails to demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had further impeached

23

Lockhart, the post-conviction court did not unreasonably deny the claim. Strickland, 466 U.S. at 694. Johnson v. Alabama, 256 F.3d 1156, 1185–87 (11th Cir. 2001).

Ground Two is **DENIED**.

### C. Ground Three

Bell asserts that trial counsel deficiently performed at trial by "opening the door" to the admission of evidence that Bell wanted to kill Charlie Bell, his brother. (Doc. 1 at 8).

On direct examination, Adlai Bell, Bell's brother, testified that, after the murder, Bell traveled to Arizona and confessed that he killed a person named "Chip" by shooting him two or three times in the upper part of the body. (Doc. 13-3 at 728–30). Also, Adlai testified that he and Bell had a third brother named Charlie. (Doc. 13-3 at 727).

On cross-examination, Adlai testified that, when a detective contacted him about the murder, he spoke with Charlie. (Doc. 13-3 at 738–39). He testified that, during the conversation, Charlie wore a recording device provided by the detective. (Doc. 13-3 at 739–40). He testified that Charlie told him that Bell killed a coworker. (Doc. 13-3 at 740, 742).

24

Adlai further testified that, sometimes, the relationship between him, Bell, and Charlie strained. (Doc. 13-3 at 742–43). He testified that Bell was financially more successful than him and Charlie. (Doc. 13-3 at 743–44). He testified that he, Bell, and Charlie jointly inherited $300,000.00, and Bell was appointed the executor of the estate. (Doc. 13-3 at 745). He testified that he and Charlie asked Bell for money from the estate before probate concluded and that Bell refused to lend them money. (Doc. 13-3 at 745–46). Bell's refusal angered Adlai and Charlie because both knew that Bell had money to lend. (Doc. 13-3 at 746–47). Bell purchased a trailer for $47,000.00. (Doc. 13-3 at 750–51).

Trial counsel asked Adlai whether he knew "of any situation where [Bell] did some things to Charlie that would make Charlie go to extremes?" (Doc. 13-3 at 754). The prosecutor objected, and the trial judge sustained the objection and determined that the testimony about Charlie was not relevant because the prosecutor did not intend to call Charlie to testify. (Doc. 13-3 at 756, 758).

Trial counsel asked Adlai when he learned that Charlie wore the recording device, and Adlai responded that he did not know the day when he

learned about the device but added that he prevented Bell from killing Charlie when he and Bell learned about the device (Doc. 13-3 at 759–60):

[Trial counsel:] Now, you become aware at some time, did you not, that your conversations between Charlie Bell and yourself were being bugged, correct, wired?

[Adlai:] Yes.

[Trial counsel:] And Charlie was wired?

[Adlai:] Yes.

[Trial counsel:] And you discovered that how soon after the fact?

[Adlai:] I can't—I can't give you a date on it but I—we all seemed to be able to discover it at the same time and at that time I had to stop [Bell] from killing Charlie.

[Trial counsel:] I'm sorry?

[Adlai:] I said at the time when it was discovered that Charlie was wired, when it seemed that we were all in the same room at that time, and [Bell] wanted to kill Charlie.

[Trial counsel:] Sir, you're testifying now that [Bell] wanted to kill Charlie as well?

[Adlai:] Yes.

26

Adlai admitted that he had "no proof" that Bell intended to kill Charlie

(Doc. 13-3 at 763, 770):

[Trial counsel:]   So you have—you agree you have a
                   motive to testify and your hope that
                   that might bring you, quote, reward
                   money?

[Adlai:]           Well, it could—it's a couple of
                   things involved in that because if
                   you didn't—if [Bell] continued to
                   roll like he was rolling he would
                   have killed Charlie, so I mean it
                   was more so protection of my other
                   brother.

[Trial counsel:]   Sir, you have no proof that [Bell]
                   ever had the intent of killing
                   Charlie, do you?

[Adlai:]           No, sir, I don't.

[Trial counsel:]   Do you?

[Adlai:]           I don't have any proof of anything
                   that [occurred] here.

[Trial counsel:]   Right.

[Adlai:]           I was in Arizona.

On redirect examination, the prosecutor asked Adlai why he believed

that Bell wanted to kill Charlie, and Adlai responded that Bell wanted to kill

Charlie because of the recording device. (Doc. 13-3 at 772). He testified that

27

he learned from his sister about Bell's intent to kill Charlie. (Doc. 13-3 at
772). Trial counsel objected to the testimony based on hearsay, and the trial
judge sustained the objection. (Doc. 13-3 at 772).

At a sidebar conference, the trial judge rejected the prosecutor's
argument that trial counsel had opened the door to the hearsay testimony.
(Doc. 13-3 at 774). The trial judge further instructed the jury to disregard the
testimony (Doc. 13-3 at 775):

> [Trial judge:]    Ladies and gentlemen, the jury will
> disregard the testimony of the
> witness as based on hearsay
> regarding the defendant's alleged
> intent to kill Charlie Bell.

The post-conviction court denied the ineffective assistance of counsel
claim after determining that trial counsel did not open the door to the
testimony by Adlai about Bell's intent to kill Charlie. (Doc. 13-10 at 138). The
post-conviction court concluded that Adlai volunteered the testimony without
a question by trial counsel. (Doc. 13-10 at 138). The post-conviction court
further determined that, after Adlai testified about Bell's intent to kill
Charlie, trial counsel cross-examined Adlai to establish that Adlai had "no
proof" that Bell intended to kill Charlie. (Doc. 13-10 at 138). The
post-conviction court further determined that, on redirect examination, trial

28

counsel successfully objected to any further testimony about Bell's intent to kill Charlie and obtained a curative instruction. (Doc. 13-10 at 138–39).

Whether trial counsel opened the door to the testimony by Adlai about Bell's intent to kill Charlie is an issue of state law, and a state court's determination of state law receives deference in federal court. Pinkney, 876 F.3d at 1295. The record supports the post-conviction court's determination that trial counsel did not open the door. 28 U.S.C. § 2254(d)(2). Trial counsel asked Adlai when he learned that Charlie used the recording device. (Doc. 13-3 at 759). Adlai responded that he did not know the date when he learned about the recording device and that he and Bell learned about the recording device on the same day. (Doc. 13-3 at 759). Adlai added that "at that time, [he] had to stop [Bell] from killing Charlie." (Doc. 13-3 at 759–60). Because Adlai's response about Bell attempting to kill Charlie did not answer trial counsel's question, trial counsel did not deficiently perform. Bozeman v. State, 698 So. 2d 629, 631 (Fla. 4th DCA 1997) ("To open the door to evidence of prior bad acts, the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled.").

29

Also, on cross-examination, Adlai admitted that he had "no proof" of Bell's intent to kill Charlie. (Doc. 13-3 at 763). The trial judge instructed the jury to disregard Adlai's testimony about Bell's intent to kill Charlie. (Doc. 13-3 at 775). This Court presumes that the jury followed the trial judge's instruction. Samia v. United States, 599 U.S. 635, 646 (2023). During closing, the prosecutor complied with the trial judge's ruling and did not mention the testimony about Bell's intent to kill Charlie. (Doc. 13-3 at 1013–15, 1066–67). Consequently, Bell failed to demonstrate a reasonable probability the outcome at trial would have changed if Adlai had not testified about Bell's intent to kill Charlie. Strickland, 466 U.S. at 694.

Because Bell failed to demonstrate either deficient performance or prejudice under Strickland, the post-conviction court did not unreasonably deny the claim.

Ground Three is **DENIED**.

30

## D. Ground Four

Bell asserts that trial counsel deficiently performed by not investigating and presenting evidence of his wealth to rebut the prosecutor's argument that he murdered Oley for financial reasons. (Doc. 1 at 10).

The post-conviction court denied the claim because evidence of Bell's wealth was introduced at trial. (Doc. 13-10 at 139–40). A financial controller for the company that contracted with Bell testified that the company paid Bell $10,800.00 in 2005, $86,000.00 in 2006, $120,000.00 in 2007, and $9,600.00 in 2008. (Doc. 13-3 at 577). The murder occurred on January 23, 2008. (Doc. 13-3 at 426–30).

On cross-examination, Adlai Bell, Bell's brother, testified that Bell was "the more successful of all the siblings" and that he and the other siblings asked Bell for money. (Doc. 13-3 at 743–44). He testified that Bell helped his siblings if Bell could. (Doc. 13-3 at 744). He testified that Bell was appointed the executor of their aunt and uncle's estate worth $300,000.00 and that Bell purchased a trailer for $47,000.00. (Doc. 13-3 at 745, 750–51). Lockhart, Bell's fiance, testified that Bell always saved money and earned other income from a rental property and denied that Bell became angry because of the lack of work at the trucking company. (Doc. 13-3 at 791–92).

31

In his motion for post-conviction relief, Bell contended that he owned two trucks and six trailers, three cars, two motorcycles, an investment portfolio, rental properties, and a home. (Doc. 13-10 at 22–23). He further contended that he received income from sources other than truck driving, planned to inherit additional money, and did not incur significant debt. (Doc. 13-10 at 22–23). However, Bell failed to submit with his motion any evidence that substantiated these allegations. Because "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation," Bell failed to demonstrate deficient performance under Strickland. Aldrich, 777 F.2d at 636.

Also, because any additional evidence of Bell's wealth is cumulative to the evidence admitted at trial, Bell failed to demonstrate prejudice under Strickland. Consequently, the post-conviction court did not unreasonably deny the claim. Guardado v. Sec'y, Fla. Dep't of Corr., 112 F.4th 958, 984 (11th Cir. 2024) ("[N]o prejudice can result from the exclusion of cumulative evidence. [E]vidence presented in postconviction proceedings is cumulative or largely cumulative to . . . that presented at trial when it tells a more detailed version of the same story . . . [,] provides more or better examples[,] or

32

amplifies the themes presented to the jury.") (citations and internal quotations omitted).

Ground Four is **DENIED**.

### E. Ground Five

Bell asserts that trial counsel deficiently performed by not objecting to Juror R.H. serving on the jury after trial counsel struck the juror during jury selection. (Doc. 1 at 12).

Respondents assert that the claim is procedurally defaulted because the post-conviction court dismissed the claim as untimely. (Doc. 13 at 10–13). Bell asserts that, under Martinez v. Ryan, 566 U.S. 1 (2012), ineffective assistance of post-conviction counsel excuses the procedural default. (Doc. 19 at 4–8). For judicial economy, the Court will proceed to the merits of the claim. Lambrix v. Singletary, 520 U.S. 518, 525 (1997) (citing 28 U.S.C. § 2254(b)(2)).

During jury selection, trial counsel advised the trial judge that he did not accept Juror R.H. However, trial counsel failed to state that he either exercised a peremptory strike on the juror or requested dismissal of the juror for cause (Doc. 13-4 at 203–04):

33

[Trial judge:]      Moving on to juror number 29, [Juror R.H.], acceptable to the State[?]

[Prosecutor:]      Yes, Your Honor[.]

[Trial judge:]      Acceptable to the defense?

[Trial counsel:]    One second.

(Counsel conferring with client.)

[Trial counsel:]    No, sir.

[Trial judge:]      Moving on to juror number 30, [Juror M.], acceptable to the State?

After trial counsel exercised all his peremptory strikes, the trial judge read the names of the jurors who would serve, including Juror R.H., and asked trial counsel if the panel was acceptable without waiving any objections. (Doc. 13-4 at 208). Trial counsel did not object to Juror R.H. (Doc. 13-4 at 208). After the parties selected two alternate jurors, the trial judge read the names of the jurors who would serve, including Juror R.H., and trial counsel did not object. (Doc. 13-4 at 211–12).

After the potential jurors learned who would serve and learned that they could not keep their telephones during trial, a selected juror expressed concern because her baby was sick. (Doc. 13-4 at 215–16). Because the juror failed to raise her concern earlier, the trial judge refused to excuse the juror,

34

instead gave the juror the telephone number for his judicial assistant, and permitted the juror to share the telephone number with the person who cared for the sick baby. (Doc. 13-4 at 216–17).

The next day, before the jury was sworn, trial counsel asked the trial judge if the selected jurors could come into the courtroom because Bell wanted to confirm who was selected as a juror (Doc. 13-3 at 366):

| | |
|---|---|
| [Trial counsel:] | Your Honor, would it be a great imposition if we were to have the jurors even before you swear them in just to come and sit[;] [ ] my client [ ] just needs to see the face[s]. I mean I—you know, I know there's one for sure that we've agreed that we would have struck, and that's the lady whose child has asthma. |
| [Trial judge:] | She's an alternate. That's [Juror M.M.] |
| [Trial counsel:] | Well, that's an alternate. Oh, well, then we'll deal with—let's deal with—I'm sorry. I didn't know she was an alternate and that's why I guess if we could see them—if he could see them. I've got some fair idea that he knows but he'd feel more comfortable if he could place the face. |

35

The trial judge asked to first speak with the prosecutor and trial counsel about reconsidering the denial of trial counsel's requests to strike two jurors for cause. (Doc. 13-3 at 366–368). After summarizing the rulings, the trial judge asked trial counsel whether Bell was satisfied with the selected jurors, and trial counsel responded that Bell was not satisfied. (Doc. 13-3 at 368). After hearing additional argument from the parties, the trial judge reconsidered the rulings on the motions to strike as follows (Doc. 13-3 at 375):

> [Trial judge:]    All right. What I propose to do at this point is if we have all the jurors, let's hold them outside the courtroom, take care of all other preliminary matters, and then I'll bring the jurors in. I'll let you get a look at them again, Mr. Fallis. Before I bring them in, I'll tell you how many, if any, I'm inclined to allow you to strike, and we'll handle it that way.

During the discussion, trial counsel did not mention Juror R.H.

After addressing other matters, the trial judge asked the jurors to come into the courtroom, twice identified each individual juror, and asked the jurors to leave the courtroom for a short recess. (Doc. 13-3 at 383–86). The trial judge asked trial counsel whether Bell accepted the selected jurors, and

36

trial counsel identified jurors whom Bell wanted to excuse (Doc. 13-3 at 387–89):

[Trial judge:]     All right. Let the record reflect that the jurors have left the courtroom. What I propose is that the attorneys, and the defendant can reposition himself if he wants to hear the argument, but that you actually approach the clerk so that we can have a slightly quiet conversation. Not the clerk, but I mean the court reporter.

All the future sidebars will be over there, I'm afraid. Mr. Fallis, is your client content with the panel?

[Trial counsel:]     No, Your Honor.

[Trial judge:]     Can you express the extent of his discontent?

[Trial counsel:]     Yes, Your Honor. He—this was from yesterday when I ran out of peremptories. The gentleman whose name we cannot pronounce who—

[Trial judge:]     [Juror B.]

[Trial counsel:]     —you can. That's one, and once again, Your Honor, he has problems with the alternate who we spoke about earlier, the one whose child has asthma.

37

[Trial judge:]    All right. So he wants [Juror B.] stricken, is that correct?

[Trial counsel:]    (Nods head affirmatively.)

[Trial judge:]    And that's the only one from the panel that he wants stricken, is that correct?

[Trial counsel:]    Correct.

[Trial judge:]    I'm prepared at this time to find that I should have stricken [Juror D.M.] and based on that I'm prepared—I should have—

[Trial counsel:]    She's not on the panel.

[Trial judge:]    I should have stricken [Juror D.M.] for cause yesterday.

[Trial counsel:]    Correct.

[Trial judge:]    She was not sufficiently rehabilitated based on my recent reading of the case law. I'll allow you one peremptory challenge— excuse me, one challenge for cause, so your request for an additional peremptory challenge is granted. Who do you want to exercise that against?

[Trial counsel:]    Well, the chances of the alternate sitting are less than—

[Trial judge:]    We'll come to that in a second.

38

| | |
|---|---|
| [Trial counsel:] | Okay. [Juror B.] |
| [Trial judge:] | So, I'll go ahead and—State, you want to be heard? |
| [Prosecutor:] | No, sir. |
| [Trial judge:] | All right. I'll go ahead and grant the strike for cause and [Juror B.] will be excused—correct that. I'll grant the peremptory challenge. I should have granted a strike for cause to [Juror D.M.] You have a peremptory challenge with [Juror B.] I'll grant the strike for cause. [Juror B.] will be dismissed. |

After dismissing Juror B. and denying trial counsel's request to dismiss the alternate juror with the sick baby for cause, the trial judge asked trial counsel whether Bell accepted the panel, and trial counsel confirmed that Bell accepted the panel (Doc. 13-3 at 394–95):

| | |
|---|---|
| [Trial judge:] | So that the record is clear, you've now discussed the issues with your client. Mr. Fallis, is that correct? |
| [Trial counsel:] | Yes. |
| [Trial judge:] | He is satisfied and prepared to go forward? |
| [Trial counsel:] | With the exception of my objection on the issue. |

. . .

39

[Trial judge:]    I'm sorry, Mr. Fallis, I was asking whether or not after conferring with your client, is he prepared to go forward with this panel, is that correct?

[Trial counsel:]    Yes.

[Trial judge:]    Okay. Subject to the objection you raise with respect to the alternate, is that correct?

[Trial counsel:]    That is correct, Judge.

Trial counsel did not mention Juror R.H.

Even if Bell initially asked trial counsel to exercise a peremptory strike on Juror R.H., Bell learned the next day that Juror R.H. remained on the jury panel and failed to again ask trial counsel to exercise a strike on the juror. Because "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant," Bell fails to demonstrate deficient performance under Strickland. Strickland, 466 U.S. at 691.

Also, in his supplement to the motion for post-conviction relief, Bell argued that trial counsel should have exercised a peremptory challenge on Juror R.H. because during jury selection the juror stated that "all his family, close friends, and himself have been victims of crime."

40

(Doc. 13-10 at 87). He argued that, because the juror and the juror's family and friends were victims of crime, the juror "would harbor potential bias against persons accused of crimes, especially [Bell]." (Doc. 13-10 at 87).

However, during jury selection, Juror R.H. stated that he had family members and close friends who were victims of crime and other family members and close friends who were accused of crimes (Doc. 13-4 at 72):

> [Juror R.H.]: My name is [R.H.] Born April 18, 1988. I live in Oceanway. I've lived in Duval County for twenty years, in Florida for twenty-three. Current residence two years, former residence two years. I'm single. I work in the food and beverage industry. I have never served as a juror. I have no children. I have a close friend that's military police. All my family members, [a] close friend, and myself have been the victim of crimes. And I've had close friends and family members accused of crimes.

Also, the prosecutor specifically asked Juror R.H. and the potential jurors seated on his row whether any juror wanted to speak about "a situation in their personal life," and Juror R.H. did not respond. (Doc. 13-4 at 121–22).

41

During jury selection, the potential jurors agreed to follow the law as instructed and to render a fair and impartial verdict based on the evidence presented at trial. (Doc. 13-4 at 47–49). The potential jurors agreed to set aside any preconceived notions about the case. (Doc. 13-3 at 49). Also, before deliberations, the trial judge instructed the jurors to reach a verdict based on both the evidence and testimony presented at trial and the instructions on the law and prohibited the jurors from "decid[ing] for or against anyone because [a juror] feel[s] sorry for anyone or [is] angry at anyone." (Doc. 13-3 at 1081). A federal habeas court presumes that a juror follows the trial judge's instructions. Brown, 255 F.3d at 1280.

Because Bell fails to demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel exercised a peremptory challenge on Juror R.H. and instead speculates that the jury would have reached a different verdict, Bell fails to demonstrate prejudice under Strickland. Strickland, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). Owen v. Fla. Dep't of Corr., 686 F.3d 1181, 1201 (11th Cir. 2012) ("To show that there is a reasonable probability that, but for counsel's

42

unprofessional errors, the result of the proceeding would have been different, Owen must show that at least one juror was biased; if no juror were biased, then there is no reasonable probability that . . . the result of the proceeding would have been different.") (citations and internal quotations omitted).

Ground Five is **DENIED**.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Bell seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Bell "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would

43

find the district court's assessment of the constitutional claims debatable or wrong. Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.     The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.     The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.     If Bell appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that

may be filed in this case. Such termination shall serve as a denial of the motion.

4.    The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this ⟨handwritten⟩ day of March, 2025.

HARVEY E. SCHLESINGER
United States District Judge

45